[Cite as *Burgett v. SD Orrville, L.L.C.*, 2025-Ohio-5837.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF WAYNE | ) | |

KYLE BURGETT

    Appellee

v.

SD ORRVILLE, LLC, d/b/a/ SERPENTINI
CHEVROLET BUICK OF ORRVILLE

    Appellant

C.A. No.     25AP0002

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF WAYNE, OHIO
CASE No.    2023 CVC-H 000434

DECISION AND JOURNAL ENTRY

Dated: December 31, 2025

STEVENSON, Judge.

**{¶1}** Defendant-Appellant SD Orrville, LLC, d/b/a Serpentini Chevrolet Buick of Orrville ("Serpentini") appeals the judgment of the Wayne County Court of Common Pleas finding that Serpentini violated the Ohio Consumer Sales Practices and Magnuson Moss Warranty Acts; that it committed fraud against Plaintiff-Appellee Kyle Burgett ("Burgett"); that Burgett was entitled to actual damages in the amount of $14,997 trebled to $44,991; and that Serpentini owed Burgett attorney's fees in the amount of $76,099.66. We affirm in part, reverse in part, and remand for further proceedings.

I.

**{¶2}** Burgett purchased a 2019 Chevrolet Equinox from Serpentini on March 9, 2022, for $24,995. Burgett relied on Serpentini's web page advertisement that its used cars were certified and subject to a 172-point inspection and comprehensive evaluation prior to purchase. The vehicle was also Q Certified, which meant that it had undergone a rigorous inspection and reconditioning

process of all major systems to ensure that it met high standards for safety and reliability. The Q Certification included a limited powertrain warranty which provided that Serpentini would repair certain mechanical issues should they arise within the specified warranty period.

{¶3} The salesman at Serpentini provided Burgett with a Carfax report that itemized the maintenance history of the vehicle. The Carfax report disclosed that the vehicle had been in a minor accident which the salesman explained meant something small and cosmetic like a paint scratch or a dent. The salesman also told Burgett that the vehicle had undergone a multipoint inspection, had been fully serviced, and that anything that did not meet Serpentini's standards had been repaired. One of the advertised features that particularly attracted Burgett was the HD Surround Vision 360 camera. The Q Certification was also important to Burgett in making his purchasing decision because he was not very knowledgeable about cars.

{¶4} Serpentini had purchased the vehicle from Manheim Auction before offering it for sale. Serpentini's technician testified that he did not notice any damage when the vehicle was purchased from Manheim except for what was disclosed in the Carfax report. However, Serpentini was unable to produce any documentation from the certification or inspection process.

{¶5} After a few weeks of owning the vehicle, Burgett discovered that the front camera was missing and Serpentini replaced it. Burgett also had an issue with the aim of the headlights. When he took the vehicle back to Serpentini for repair, Burgett observed the service advisor adjust the headlight aim by a switch or dial near the headlight. Burgett took the vehicle back to Serpentini again in February 2023 because the front camera stopped working. A new camera was installed which required removal of the front bumper. That new camera stopped working as well, but Serpentini told Burgett that it would not cover the repair cost of $6,500.

{¶6}  In March 2023, another vehicle backed into Burgett's Equinox in a parking garage while travelling at less than five miles per hour.  Burgett's vehicle sustained only very minor damage. He took it to Ellsworth Auto Body ("Ellsworth") for repair.  Burgett was informed by Ellsworth that in addition to the minor accident damage, there was pre-existing structural damage to the vehicle, specifically a makeshift headlamp bracket, rust and corrosion in the cord connected to the front camera, and the passenger-side frame rail did not line up properly. The frame rail also had missing bolts due to the improper alignment.  Ellsworth repaired the minor accident damage but not the pre-existing structural damage because the latter was not covered by insurance and Burgett could not afford the cost out of pocket.  Ellsworth estimated the repair cost for the prior structural damage at $4,974.99.

{¶7}  Through counsel, Burgett made a written demand to Serpentini for revocation of the vehicle purchase in June 2023.  The letter stated in pertinent part that:

> [t]his vehicle was sold by your dealership with severe undisclosed structural/frame damage. Your dealership either knew or should have known of the frame damage. . . .

> [Burgett] hereby revokes acceptance of the 2019 Chevrolet Equinox and demands return of all amounts paid regarding the vehicle and reasonable attorneys' fees and costs. . . . If I do not receive acceptance of the revocation and instructions within 20 days . . . we will presume that you have refused to accept the revocation.

{¶8}  Serpentini did not respond to the letter.  In November 2023, Burgett filed a complaint against Serpentini alleging violations of the Ohio Consumer Sales Practices Act ("CSPA") under R.C. 1345.01 *et seq*., the Magnuson Moss Warranty Act ("MMWA") under 15 U.S.C. 2301 *et seq*., and for fraud arising out of Serpentini's sale of a vehicle with undisclosed structural damage.  A bench trial took place.  In addition to his own testimony, Burgett presented testimony from Anthony Jakicic, an expert in automotive mechanics, body repair, and automotive valuation. Serpentini presented the testimony of James Pease, the Collision Director for Serpentini

Auto Groups, and Jessie Short, the Sales Manager at Serpentini. The trial court also reviewed the deposition testimony of Michael Holland, an automotive technician who was employed by Serpentini at the time of Burgett's purchase of the Equinox.

{¶9} Burgett's expert testified that the top mounting screw on the right headlamp was not installed because the mounting hole in the headlight did not line up with the mounting hole in the fender. He also noticed that the left headlamp was secured by a fabricated flat piece of aluminum with a screw through it because the mounting hole did not line up with the mounting hole in the panel underneath. He opined that these two items alone should have alerted Serpentini that there was pre-existing structural damage. In his opinion, the fabricated, non-original headlamp bracket would only have been installed if the vehicle had structural damage that prevented alignment of the headlamp. He further testified that the fabricated bracket was visible upon opening the hood and would have immediately alerted the service advisor that there was structural damage. According to Burgett, the service advisor was standing directly in front of the headlamp when he readjusted the aim, and therefore, he had a view of the fabricated bracket.

{¶10} Burgett's expert also testified that he could see from looking behind the right headlamp that the right frame rail was bent. In the photos from Ellsworth, he saw that two of the four mounting bolts for each side of the reinforcement bar of the frame rail were missing because the rails could not be properly aligned, which in his opinion should have been another clear indicator to Serpentini that there was structural damage. He also stated that the photos taken by Serpentini after receiving the vehicle from Manheim showed that the left frame rail was bent. He said that even if a technician did not see the damaged frame rail, the technician would have seen that the bumper reinforcement mounting bolts were missing which would have indicated structural damage.

{¶11}  Burgett's expert also testified that a Q Certification means the vehicle has been subject to intense scrutiny and deemed roadworthy, safe and free of damage.  He would expect a dealership to present documentation of checklists for both the Q certification and the multipoint inspection.  However, in this case, Serpentini did not present any record of such documentation for Burgett's Equinox.  Burgett's expert further testified that Burgett's 2023 collision in the parking garage caused only cosmetic damage and was not severe enough to cause structural damage.  In his opinion, Burgett's vehicle was not merchantable or roadworthy at the time of sale because there was structural damage.  He opined that the diminution in value of the vehicle; that is, the difference between what the vehicle should have been worth at purchase if it had been as represented and what it was worth with the undisclosed structural defects, was $14,997.

{¶12}  Mr. Holland stated that every vehicle sold by Serpentini was subject to a 48-point checklist that was completed electronically.  He also stated that if a Q Certification checklist had been completed, he would have been the one to fill it out and Serpentini would have retained it in its records.  However, at no point during the litigation did either Mr. Holland or anyone else from Serpentini present or claim to possess any documentation for either the Q Certification or the multipoint inspection.  Mr. Holland further stated that Serpentini did not provide any formal training or instruction to its technicians on how to inspect for frame or structural damage.  Mr. Holland did not notice that the front camera was missing when he inspected the vehicle prior to sale. He replaced the radiator on Burgett's vehicle when it came in from Manheim which required that he completely remove the front bumper cover and bumper support.  However, he denied seeing any frame rail damage or a missing camera.

{¶13}  James Pease, the Collision Director for Serpentini Auto Groups testified that in his opinion, it was clear that the 2023 accident in the parking garage resulted in damage to both the

left and right frame rails. However, he admitted on cross-examination that he stated in his deposition it would be almost impossible to determine what damage existed prior to the 2023 accident and what did not. Despite listing orally at trial the items he thought needed to be repaired, he did not provide an estimate.

{¶14} Jesse Short, the Serpentini Sales Manager, testified that if Burgett had brought the car back with his concerns about the damage to the frame rail, he would have tried to make it right. However, no one at Serpentini contacted Burgett after receiving the letter requesting revocation to offer to address Burgett's concerns.

{¶15} The trial court concluded that "[t]here is insufficient evidence to establish [Serpentini] was aware of the structural damage to the vehicle sold to [Burgett][,]" but that "[Serpentini] should have known." The trial court further noted that while Serpentini represented that the vehicle had undergone an extensive inspection and was Q Certified, the inspection was not thorough enough to discover the damage and any repairs that had been made. Based on that finding, the trial court concluded that "[Serpentini] has violated [R.C.] 1345.02(B)(2) [of] the [CSPA] by claiming the vehicle 'was of a particular standard quality, grade, style, prescription, or model, if it is not.'" The court also found that Serpentini violated the MMWA and committed fraud.

{¶16} The court awarded Burgett actual damages in the amount of $14,997, and pursuant to R.C. 1345.09(B), trebled the damages to $44,991. Burgett then moved for attorney's fees in the amount of $76,099.66. Before the expiration of the time provided by the Wayne County Local Rules for Serpentini to respond, the trial court granted Burgett's motion.

{¶17} Serpentini timely appealed and asserts three assignments of error for our review. For the reasons set forth below, we affirm in part, and reverse and remand in part.

II.

## ASSIGNMENT OF ERROR NO I:

**THE TRIAL COURT'S LIABILITY DETERMINATIONS WERE ERRONEOUS.**

{¶18} Serpentini argues under this assignment of error that there was insufficient evidence presented at trial to support the trial court's decision in favor of Burgett on each of the three claims asserted in the complaint.

{¶19} Regarding the test for sufficiency in civil cases, this Court has stated the following:

The [Ohio Supreme] Court defined the test for sufficiency as the test from *State v. Thompkins*, 78 Ohio St. 3d 380 [](1977), paragraph two of the syllabus. That test recognizes:

"sufficiency" is a term of art meaning that legal standard which is applied to determine whether . . . the evidence is legally sufficient to support the jury verdict as a matter of law. . . . In essence, sufficiency is a test of adequacy.

*Lynch v. Greenwald*, 2012-Ohio-2479, ¶ 20 (9th Dist.) quoting *Thompkins* at 386. "[A] challenge to the sufficiency of the evidence asks whether the plaintiff has met his or her burden of production by proving each element by a preponderance of the evidence." *Id.* "When a defendant argues that the judgment in a civil case is supported by insufficient evidence, we must determine whether, viewing the evidence in the light most favorable to the plaintiff, a reasonable trier of fact could find in favor of the plaintiff." *Lubanovich v. McGlocklin*, 2014-Ohio-2459, ¶ 8 (9th Dist.). "Whether the evidence is legally sufficient to sustain a verdict is a question of law." *Thompkins* at 386. Questions of law are reviewed de novo, with no deference to the trial court's determination. *Renacci v. Evans*, 2009-Ohio-5154, ¶ 13 (9th Dist.)

### The Ohio Consumer Sales Practices Act Claim

{¶20} The CSPA, which is codified in R.C. Chapter 1345, prohibits unfair or deceptive acts or practices by suppliers in consumer transactions. The act is intended to be remedial and

should be construed liberally in favor of consumers. *Einhorn v. Ford Motor Co.*, 48 Ohio St.3d 27, 29 (1990). The consumer need not prove the supplier intended to commit an unfair or deceptive act to establish a violation of the CSPA, but need only prove such an act was committed. *Garner v. Borcherding Buick, Inc.*, 84 Ohio App.3d 61, 64 (1st Dist. 1992).

{¶21} R.C. 1345.02(A) provides that:

[n]o supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction.

{¶22} "R.C. 1345.02(B) sets forth a nonexhaustive list of representations by a supplier that constitute deceptive acts or practices." *Anderson v. Discount Drug Mart, Inc.*, 2021-Ohio-693, ¶ 31 (8th Dist.). As relevant to this case, R.C. 1345.02(B)(2) prohibits a representation "[t]hat the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not[.]" "For conduct to be 'deceptive' under the CSPA, it 'must be both false and material to the consumer transaction.'" *Anderson* at ¶ 30, quoting *Grgat v. Giant Eagle, Inc.*, 2019-Ohio-4582, ¶ 15-16 (8th Dist.). "It is how the consumer views the act or statement which determines whether it is unfair or deceptive." *Frey* v. *Vin Devers, Inc.* 80 Ohio App.3d 1, 6 (6th Dist. 1992). Consequently, "[i]f the supplier does or says something, regardless of intent, which has the likelihood of inducing in the mind of the consumer a belief which is not in accord with the facts, then the act or statement is deceptive." *Id.*

{¶23} As noted above, the trial court concluded that Serpentini violated R.C. 1345.02(B)(2) of the CSPA. Specifically, the trial court found that the vehicle was sold to Burgett with structural damage and other defects despite Serpentini's alleged inspection and certification and that "[a]pparently no one who worked for [Serpentini] thoroughly inspected the vehicle to determine the repairs made or not made to the vehicle in order to sell it to the public." Serpentini

maintains that this determination is not supported by sufficient evidence and should be reversed because the evidence showed that no one at Serpentini observed the damage to the front rail that Burgett claims existed at the time he bought the car, and that if someone had seen it, the vehicle would have been sent back to Manheim for arbitration. Serpentini maintains that the evidence shows that the structural damage was caused by the March 2023 collision and was not present at the time of Burgett's purchase. We disagree.

{¶24} The record contains evidence reflecting that Serpentini represented the vehicle as Q Certified and that it had passed a multipoint inspection. There was no dispute that a vehicle with a Q Certification should be safe, roadworthy, and free from any damage that was capable of being detected during the certification and inspection process. In making his purchasing decision, Burgett accepted Serpentini's representations as true and accurate that the vehicle had been inspected and met high standards for safety and roadworthiness. Burgett introduced substantial evidence through his expert, Mr. Jakicic, establishing that there was unsafe structural damage present prior to the sale of the vehicle to Burgett. Mr. Jakicic was qualified as an expert and had over 40 years of experience. Thus, Serpentini's claims that the vehicle was safe and free from structural damage had the likelihood of inducing in Burgett's mind a belief which was not in accord with the facts, and were therefore deceptive. *Frey,* 80 Ohio App. 3d at 6 (6th Dist. 1992). While Serpentini argues that Mr. Jakicic's testimony was not credible, a sufficiency analysis requires us to view the evidence in the light most favorable to the plaintiff, so we do not consider Serpentini's credibility argument in this assignment of error.

{¶25} Moreover, Serpentini could not produce any records showing that the vehicle was actually Q Certified and inspected. The trial court was free to presume from that fact that either the inspections were not completed, or if they were completed, the documents containing the

results no longer existed or were not presented because they were unfavorable to Serpentini. In addition, Burgett viewed Serpentini's representation that the vehicle had a working front camera as true when in fact it had no camera. Therefore, that representation was deceptive as well because it "induc[ed] in the mind of [Burgett] a belief which [was] not in accord with the facts[.]" *Frey* at 6 (6th Dist.). Although Serpentini replaced the camera twice, it failed a third time, and Serpentini refused to repair or replace it in order bring the vehicle up to the advertised quality.

{¶26} Based on the foregoing, and viewing the evidence in the light most favorable to Burgett, we conclude that a reasonable trier of fact could have found that Serpentini violated R.C. 1345.02(B)(2) by claiming that the vehicle was "of a particular standard, quality, grade, style, prescription, or model, if it is not[.]" There was sufficient evidence that Serpentini sold the vehicle with undisclosed structural damage, contrary to Serpentini's representation that the vehicle had been thoroughly inspected and was safe, roadworthy, and free from damage regarding features that were material to the transaction. *Anderson*, 2021-Ohio-693 at ¶ 30 (8th Dist.). Serpentini's argument regarding the CSPA claim is overruled.

### Magnuson Moss Warranty Act Claim

{¶27} The MMWA, codified at 15 U.S.C. 2301, *et. seq.*, is a federal statute that establishes "a federal right of action for consumers to enforce written or implied warranties against suppliers, warrantors, or service contractors." *Curl v. Volkswagen of Am., Inc.*, 2007-Ohio-3609, ¶ 10. The MMWA does not establish new warranties, but "looks to the governing state law and adopts the implied warranty protections already established." *Id*. In Ohio, the implied warranty of merchantability is part of a contract for sale unless excluded or modified. R.C. 1302.27. Here, neither party alleges that Serpentini disclaimed or modified the implied warranty of merchantability.

{¶28} Burgett alleged in his complaint that Serpentini's sale of the vehicle with undisclosed structural damage constituted a breach of the implied warranty of merchantability. He also alleged that Serpentini's advertisement that the vehicle had a front camera created an express written warranty, and that its failure to provide a vehicle with a functioning front camera was a violation of that express warranty.

## Breach of Implied Warranty

{¶29} The implied warranty of merchantability in Ohio requires that goods must be "fit for the ordinary purposes for which such goods are used[.]" R.C. 1302.27(B)(3). The MMWA provides at 15 U.S.C. 2310(e) that no action may be brought under the MMWA for failure to comply with an obligation under an implied warranty unless the warrantor is afforded "a reasonable opportunity to cure such failure to comply." Serpentini argues that the trial court's judgment on this claim must be reversed because the record contains no competent, credible evidence demonstrating that Burgett provided it a reasonable number of attempts to repair the damaged rail, and instead, through his lawyer, demanded rescission of the purchase. Serpentini maintains that it could have fixed the front rail for less than $1,000. Serpentini pointed out that Ellsworth's estimate of the costs to repair the pre-existing damage was $710.15.

{¶30} Notably, the MMWA contains no definition for the term "cure," nor does it state that the opportunity to cure is restricted to attempts to repair or any other specific remedial action. Since the MMWA does not require attempts at repair in order to prove a breach of the implied warranty, we then "look[] to the governing state law[,]" and whether Ohio law requires a reasonable number of attempts at repair. *Curl,* 2007-Ohio-3609, at ¶ 10. It does not. R.C. 1302.65(C)(1) addresses revocation after delivery has been accepted and requires that "the buyer must within a reasonable time after he discovers or should have discovered any breach *notify* the

seller of breach or be barred from any remedy[.]" (Emphasis added.) There is no language mandating attempts at repair, only that the buyer gives notification of the breach.

{¶31} Burgett's counsel gave Serpentini timely notice of the alleged breach in its June 2023 letter requesting revocation of the sale. As explained above, that notification was the only action required of Burgett under the MMWA and Ohio's implied warranty of merchantability statute. If, as Serpentini claims in this appeal, it believed that Burgett's notice did not set forth the proper remedy and that it should have been granted an opportunity to attempt to repair the vehicle, Serpentini should have responded that it was going to exercise its right to cure by repairing the frame rail. However, Serpentini did not do so. Serpentini's failure to respond at all to Burgett's notice of defects establishes its failure to cure in this matter. Thus, there is sufficient evidence to support the trial court's finding that there was a violation of the implied warranty portion of the MMWA in this case. Because we find that there was a showing of an implied warranty of merchantability, we need not consider the express warranty violation of the MMWA.

### Fraud Claim

{¶32} The trial court found that:

[Serpentini] committed fraud by representing to [Burgett] the vehicle had undergone a comprehensive inspection and was "Q" certified. The representations were not accurate. The vehicle had structural damage, was unsafe and not roadworthy.

{¶33} As noted above, it also found that "[a]pparently no one who worked for [Serpentini] thoroughly inspected the vehicle to determine the repairs made or not made to the vehicle in order to sell it to the public." Stated another way, the trial court's finding is that Serpentini falsely represented that the vehicle had been inspected and was Q Certified when it was not as evidenced by the structural damage which made the vehicle unsafe and not roadworthy, and that if Serpentini had actually conducted a comprehensive inspection, it should have detected the damage.

**{¶34}** The elements of fraud are:

> 1) a representation, or in a situation where there was a duty to disclose, a concealment of fact; 2) which fact is material to the transaction; 3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; 4) with the intent of misleading another into relying upon it; 5) justifiable reliance on the misrepresentation; and 6) a resulting injury proximately caused by the reliance.

*Garvey v. Clevidence,* 2004-Ohio-6536, ¶ 12 (9th Dist.).

**{¶35}** Serpentini argues that Burgett failed to prove that the damage existed at the time of sale, or if it did, that Serpentini knew about it and thus had a duty to disclose it. Serpentini argues that there was no evidence to show that it made representations with the intent of misleading Burgett into relying on them. In support, Serpentini emphasizes that the trial court found that there was "insufficient evidence to establish [Serpentini] was aware of the structural damage" to Burgett's vehicle and that Serpentini merely "should have known" about it, which does not rise to the level of fraud. We disagree.

**{¶36}** First, the trial court's conclusion that Serpentini "should have known" about the structural damage, that no one from Serpentini thoroughly inspected the vehicle, and that Serpentini "was on notice that the vehicle was involved in an accident with front-end damage" is tantamount to a finding that Serpentini met the second element of fraud; *i.e.,* that it acted with "utter disregard and recklessness as to whether it is true or false that knowledge may be inferred[.]" *Garvey* at ¶ 12. As previously established, there was substantial evidence demonstrating that Serpentini represented to Burgett that the vehicle had an HD Surround Vision camera, that it had undergone a comprehensive multipoint inspection, and that the vehicle was Q Certified. There is sufficient evidence that all of those representations were false. The front camera was missing at the time of sale, the vehicle had structural damage and was unsafe such that it did not qualify to be Q Certified, and there was no documentation of the Q Certification or the multipoint inspection

which means that it never existed, was not completed, or was discarded. The record reflects that those representations were made with the intent of inducing Burgett into believing that the vehicle was safe, merchantable, and roadworthy because of the Q Certification and inspection, and Burgett relied on those statements. Serpentini sold Burgett a vehicle advertised as having certain features and was safe and free from damage when it had no record of proving it undertook the inspection to certify that those statements were accurate. Serpentini's argument regarding this claim is overruled.

{¶37} Based on the foregoing, Serpentini's first assignment of error is overruled.

**ASSIGNMENT OF ERROR NO II:**

**THE TRIAL COURT'S DAMAGES AWARD WAS ERRONEOUS.**

**Economic Damages**

{¶38} The CSPA provides for damages for rescission or actual economic damages plus noneconomic damages up to $5,000. R.C. 1345.09(B). Burgett elected actual damages and the trial court awarded him $14,997, which represented the amount that the value of the vehicle had been diminished by Serpentini's actions in violation of the CSPA.

{¶39} Serpentini argues that because the trial court incorrectly entered judgment in favor or Burgett on each of his claims, he is not entitled to any damages; however, assuming he were entitled to damages, the trial court's award of $14,997 constituted an abuse of discretion. Serpentini argues that the correct measure of damages for a CSPA violation is the cost of the repairs, which it claims is less than $1,000 per the testimony of Mr. Pease and the Ellsworth estimate. Serpentini maintains that this is "the amount necessary to place the non-breaching party in the same position they would have been had the breaching party fully performed, the idea being to make the non-breaching party whole." *Williams v. Gray Guy Group, L.L.C.*, 2016-Ohio-8499,

¶ 28 (10th Dist.).  Serpentini further argues that in arriving at the diminution in value number, Burgett's expert improperly considered several cosmetic defects that existed after the March 2023 collision, defects that Burgett was aware of at the time of purchase based on the Carfax report, thus disqualifying him from being eligible for those damages under the CSPA.

{¶40}  This Court addressed the measure of damages under the CSPA in *Averback v. Montrose Ford, Inc.*, 2019-Ohio-373 (9th Dist.).  In that case, we stated that where the consumer elects damages under the CSPA for a claim involving deception, the consumer is entitled to expectancy damages, "'the difference between the value of property as it was represented to be and its actual value at the time it was received or purchased.'" *Id.* at ¶ 38, quoting *State v. Rose Chevrolet, Inc.*, 1993 WL 229392, *2 (12th Dist. June 28, 1993).  "This measure of damages is also referred to as the 'benefit of the bargain' rule." *Id.*

{¶41}  Where the appellant is challenging the amount of a damage award, the standard of review is abuse of discretion. *Id.* at ¶ 32.  An abuse of discretion "implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶42}  Burgett's expert stated in his report that the $14,997 diminution was "[d]ue to the structural defects present and the poor and unprofessional manner that the documented front-end damage was repaired prior to sale or possession by [Serpentini], and the unknown nature of the extent of pre-existing damage due to the unprofessional manner this vehicle was repaired with . . . ."  While his report also identified cosmetic defects that reduced the vehicle's value, he did not provide a diminution value for those cosmetic defects.  In addition, his testimony on this issue was that "[t]hen I have to take into account the structural damage to the vehicle and the cost to repair that structural damage to bring that vehicle back to even rough trade condition, *because we're not*

*going to address things like the poor paint work . . .* you're going to be pulling the frame, replacing, maybe the rail structural stuff." (Emphasis added.). Thus, the record reflects that Jakicic did not include the cosmetic damage in his diminution in value determination.

{¶43} Based on the foregoing, Serpentini has failed to establish that the court abused its discretion by including non-structural, cosmetic damage in the diminution of value award because Mr. Jakicic's report and testimony regarding the $14,997 diminution in value includes only structural damage. Serpentini's argument on this point is overruled.

### Treble Damages

{¶44} Serpentini argues that the trial court erred as a matter of law by awarding treble damages. Specifically, it argues that Burgett failed to offer any evidence during trial demonstrating his entitlement to treble damages, and that it was not until his written closing argument, weeks after he rested his case, that he attempted to present documents related to treble damages. Serpentini argues that it was too late at that juncture to submit additional evidence because closing arguments are not evidence, and thus, it was inappropriate for the trial court to consider documents that were not admitted into evidence in awarding treble damages.

{¶45} In its closing argument, Serpentini opposed the award of treble damages, but limited its argument to the allegation that Burgett did not prove that the violations were acts declared to be deceptive or unconscionable under the CSPA. Serpentini did not argue that Burgett failed to properly introduce into evidence documents demonstrating that the conduct met the statutory requirements nor did it oppose the presentation of the issue of treble damages to the trial court in closing arguments. While the trial court ordered that the parties file their closing arguments simultaneously, Serpentini could have requested, as Burgett did, to file a rebuttal brief if it wished to oppose the court's consideration of the certified opinions during closing arguments.

However, it did not do so, and thus, is improperly raising an argument on appeal that it did not raise in the trial court. *Harris v. Akron*, 2009-Ohio-3865, ¶ 9 (9th Dist.).

**{¶46}** Consequently, based on the foregoing, the trial court did not err in awarding Burgett treble damages. Serpentini's second assignment of error is overruled.

## ASSIGNMENT OF ERROR NO III:

**THE TRIAL COURT INCORRECTLY AWARDED THE PLAINTIFF ATTORNEY FEES.**

**{¶47}** Serpentini argues that the trial court's judgment granting Burgett's motion for attorney's fees should be reversed because Serpentini was not afforded appropriate due process. Specifically, Serpentini argues the trial court ruled on Burgett's motion for attorney's fees before Serpentini's response deadline lapsed and without a hearing.

**{¶48}** "Our courts have long recognized that due process requires both notice and an opportunity to be heard." *In re Thompkins*, 2007-Ohio-5238, ¶ 13. "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

> This Court has explained that [l]ocal rules are of a court's own making - not substantive principles of law—and there is generally no error if a court exercises its discretion to deviate from its rules in a particular case. *If, however, the trial court's failure to comply with local rules implicates issues of due process, depriving a party of a reasonable opportunity to defend against the disposition of the case in favor of the other party, the trial court is bound to comply with its local rules.*

(Emphasis added.) (Internal quotations and citations omitted.) *Sellers-Smith v. Smith*, 2023-Ohio-1022, ¶ 9 (9th Dist.).

{¶49} Wayne County Loc. R. 4(C)(2) provides that all motions other than for summary judgment "will be decided without oral hearing unless oral argument is requested and determined necessary by the Court[,] [and] . . . [e]ach party opposing the motion shall file a written response within twenty-eight days after receipt of the motion."

{¶50} Here, the trial court granted Burgett's motion for attorney's fees nine days before the 28-day response deadline, thus depriving Serpentini of the opportunity to oppose the motion. Therefore, we conclude that the trial court erred by not affording Serpentini an opportunity to be heard on the matter. *See Henry Cty. Bank v. Toledo Radio, LLC*, 2022-Ohio-1360, ¶ 6, 11 (3d Dist.) (holding that the trial court committed reversible error by ruling on a motion before the appellant had the opportunity to file a reply brief, which contravened the applicable civil and local rules); *see also Gibson-Myers & Assoc., Inc. v. Pearce*, 1999 WL 980562, *4 (9th Dist. Oct. 27, 1999), quoting *Miller v. Lint,* 62 Ohio St.2d 209, 215 (1980) (addressing the Ohio Rules of Civil Procedure and providing that, "[h]owever hurried a court may be in its efforts to reach the merits of a controversy, the integrity of procedural rules is dependent upon consistent enforcement . . . ."); *CACV of Colorado, LLC v. Majkic*, 2007-Ohio-2890, ¶ 4 (9th Dist.) ("A trial court . . . commits reversible error when it ignores the response time created by the Ohio Rules of Civil Procedure.").

{¶51} Serpentini's third assignment of error is sustained on the above basis.

III.

{¶52} Serpentini's first and second assignments of error are overruled. Serpentini's third assignment of error is sustained. The judgment of the Wayne County Court of Common Pleas is affirmed in part, reversed in part, and the cause is remanded for further proceedings consistent with this decision.

19

Judgment affirmed in part,
reversed in part,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

SCOT STEVENSON
FOR THE COURT

FLAGG LANZINGER, P. J.
SUTTON, J.
CONCUR.

APPEARANCES:

EMILY K. ANGELWICZ, Attorney at Law, for Appellant.

JOSEPH T. DATTILO, Attorney at Law, for Appellant.

GRANT L. MCCLEOD, Attorney at Law, for Appellant.

CHRISTINA GILL ROSEMAN, Attorney at Law, for Appellee.